# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2168

ROBERT FOLEY and PATRICIA FOLEY,

*Plaintiffs-Appellants*,

v.

CITY OF LAFAYETTE, INDIANA, and FRED TAYLOR,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 C 69—**Allen Sharp**, *Judge.*

———————

ARGUED OCTOBER 29, 2003—DECIDED MARCH 8, 2004

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Robert Foley alleges that the City of Lafayette violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 by failing to provide adequate egress from the city-owned train-station platform. The district court, relying on 49 C.F.R. § 37.161, concluded that the inoperable elevators and snow-covered ramp that prevented Foley from an easy exit from the platform were non-actionable isolated or temporary conditions as a matter of law. Because we agree with the district

court's conclusion, we affirm the grant of summary judgment to the City of Lafayette.

## I. History

Robert Foley, a lifetime resident of West Virginia, has suffered from significant pain in his legs and back since a work-related injury in August of 2000. From the time of his injury, he has relied on a wheelchair because of intense pain caused by standing or walking. Robert's health problems are compounded by his morbid obesity—he weighs nearly four hundred pounds—and diabetes.

In December of 2000, Robert decided to travel to Indiana so that he could celebrate the holidays with his extended family. Robert's brother, Greg, hosting the proposed reunion at his home in Battle Ground (a town near Lafayette), made arrangements for Robert to travel from West Virginia to Indiana by train. Greg chose this means of transportation in part because the Lafayette train station is advertised by Amtrak as fully accessible to persons in wheelchairs. Joined by his teenage son, David, Robert left West Virginia on December 17 with an estimated time of arrival in Lafayette of 7:08 a.m. on Monday, December 18.

The sole Lafayette train station is owned and operated by the City of Lafayette. Amtrak, Greyhound, the city bus system, and several other organizations utilize the station as a depot and/or for office space. Fred Taylor was the only City employee assigned to the station on a regular basis during the time period in question. Taylor performed maintenance and janitorial work. He worked from 6:00 a.m. to 3:00 p.m., Monday through Friday. Bill O'Connor, an employee of the Downtown Business Center,[1] also worked

---

[1] The Downtown Business Center of Greater Lafayette, Inc., a

(continued...)

at the station. His duties mirrored those of Taylor, he often followed orders given by Taylor, and he usually started work at 2:30 p.m. and ended work around 11:30 p.m. Two passenger trains stop at the Lafayette station each day of the week; in December of 2000, the northbound train had a scheduled arrival time of 7:08 a.m., and the southbound train had a scheduled arrival time of 11:38 p.m.

The train station is located at Riehle Plaza in downtown Lafayette and is situated on the east side of the tracks. Passenger trains arriving in Lafayette unload at a ground-level platform on the west side of the tracks. The facility has three levels.

In order to reach the parking lot on the east side of the tracks, passengers must go up to the third level, by way of stairs or an elevator, to a short bridge that crosses above the tracks. After crossing the short bridge, passengers can take the east-side stairs or elevator to descend to the middle or ground-floor levels of the station, where they can access the parking lot.

Alternatively, by taking either the stairs or a ramp up one level from the west-side platform, passengers can reach a pedestrian bridge and cross west over the Wabash River into the adjacent community of West Lafayette. This pedestrian bridge is large enough to be accessed by vehicles for emergency purposes from the West Lafayette side of the river.

It is undisputed that significant snowfall, up to nine inches, blanketed the Lafayette area over the weekend prior to Robert's arrival. It is also uncontested that it was extremely cold and that the wind was particularly strong on

(...continued)

non-profit Indiana corporation, was one of the entities that utilized office space at the station.

the morning of December 18. In resolving all factual disputes in favor of Robert, we assume that the bulk of the snow fell early in the weekend, but there is no dispute that blizzard-like conditions prevailed through Monday morning due to a large amount of snow on the ground and strong winds.

At 6:00 a.m. on December 18, Greg Foley set out with his brother-in-law, Mike Flagg, to pick up Robert. Although the ten-mile trip from Battle Ground usually took about twenty minutes, the harsh winter conditions led to an arrival forty-five minutes later at 6:45 a.m. When Greg arrived at the station, he discovered that neither of the elevators were working. Concerned, Greg notified Fred Taylor. Taylor was surprised and may have tried to fix the problem by switching a circuit breaker. At his deposition, Taylor recalled that the elevators were broken the previous week and stated that he had called his boss to report the problem.[2] Taylor notified Greg that the train had been delayed for two hours, but provided no further assistance to the Foleys. Greg, believing that Taylor would take care of the necessary repairs, took his family to breakfast. Taylor, in fact, spent most of the balance of his day shoveling snow, assisting other patrons of the depot, and attending to routine duties.

Greg returned to the station at approximately 9:00 a.m., and with Taylor present, he expressed concern about the inoperable elevators to Jane Ness, an employee of the Downtown Business Center. Whereupon Ness contacted the Indianapolis branch of Montgomery Kone, a Moline, Illinois company that was the contract provider of maintenance and

---

[2] Although Taylor's testimony lacks clarity, it appears that he discovered and reported the problem late the previous week, either on Thursday or Friday. There is nothing in the record to indicate what actions, if any, were taken by Taylor's supervisor, Ed Lehman, if Taylor indeed notified Lehman that the elevators were out of service.

repair services for the elevators.

Kone's records show the phone call for service regarding the train-station elevators was received at 9:13 a.m. At 9:31 a.m., Kone dispatched a Lafayette-area repairman to the scene. He arrived at 10:00 a.m. In commencing the repairs, it was discovered that the heating elements necessary to maintain the proper temperature of the oil in the outdoor hydraulic elevators were burned out. Because of the extremely cold temperatures, the elevators were rendered inoperable. Nothing further could be done that day, however, because parts were needed. The Kone repairman left sometime before 11:30 a.m.

In the meantime, Greg received misinformation from the Amtrak hotline that led him to believe that the northbound train would now not arrive until 12:30 p.m. He returned to Battle Ground with his family. The train, in fact, arrived at approximately 11:30 a.m.

Robert and his son, David, were helped off the train by Amtrak employees but were left alone in the cold weather on the platform. Amtrak does not employ personnel at the Lafayette station and the individuals who assisted the Foleys returned to their posts on the northbound train. David searched for Greg in vain. Robert and David considered the option of going up the ramp to the pedestrian bridge. They decided that the snow, not yet removed from the ramp, made maneuvering the wheelchair up the incline too difficult and dangerous. Robert, clad in light clothing, felt he could not endure the frigid temperatures. Robert decided his best option was to slowly walk up the stairs. Bill O'Connor (the Downtown Business Center employee), called in early to help shovel snow, assisted Robert by walking alongside and supporting some of Robert's weight.

Greg arrived around noon, after discovering at 11:30 a.m. that the train was not as late as the faulty estimate had

indicated. After assessing the situation, Greg and Flagg drove in Flagg's truck to the West Lafayette side and drove east on the plowed pedestrian bridge. By this point, Robert had successfully reached the top of the first flight of stairs, and everyone helped him to the truck.

The next day, Tuesday, December 19, repairs continued and one elevator was returned to service. Both elevators were made fully operational by December 22.

Robert made several trips to Lafayette's Home Hospital and visited other doctors in West Virginia. He complained of increased pain in his legs due to alleged frostbite caused by the cold air. Robert contends that the City of Lafayette discriminated against him on the basis of his disability in violation of Title II of the ADA and the Rehabilitation Act. He alleges that the lack of equal egress on the morning of December 18 constitutes a violation of these statutes. The district court granted Lafayette's motion for summary judgment and sent the state law claims to the Indiana courts.

## II. Analysis

We review de novo a grant of summary judgment. *Ross v. Town of Austin*, 343 F.3d 915, 917 (7th Cir. 2003). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

The ADA seeks to "provide a clear and comprehensive national mandate for the elimination of discrimination

against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1) (2003). In pursuit of this goal, Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services . . . of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2003). For summary judgment purposes, the district court found that Robert was protected by the ADA as a "qualified individual" under 42 U.S.C. § 12131(2), and this finding was not challenged on appeal. Furthermore, the City of Lafayette is clearly a "public entity" under 42 U.S.C. § 12131(1). Thus, the issue before us under the ADA is whether the district court was correct in finding that the City, as a matter of law, did not unlawfully discriminate, exclude, or deny services to Robert. "[S]ince Rehabilitation Act claims are analyzed under the same standards as those used for ADA claims," *Ozlowski v. Henderson*, 237 F.3d 837, 842 (7th Cir. 2001), we will confine our analysis to the ADA.

The Lafayette train station is, in the normal course of operation, fully accessible to individuals with disabilities. The dispute in this case is whether the City of Lafayette did enough to prevent and/or remedy the elevator difficulties in December of 2000. It is in this context that the district court properly relied on a rule promulgated by the Department of Transportation ("DOT") that provides guidance on the particular issue of access to mass transit facilities. This rule states:

> (a) Public and private entities providing transportation services *shall maintain in operative condition* those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities. These features include, but are not limited to . . . elevators.

(b) Accessibility features *shall be repaired promptly* if they are damaged or out of order. When an accessibility feature is out of order, the entity *shall take reasonable steps to accommodate* individuals with disabilities who would otherwise use the feature.

(c) This section *does not prohibit isolated or temporary interruptions* in service or access due to . . . repairs.

49 C.F.R. § 37.161 (emphasis added). Thus, Lafayette has three duties under this particular regulation: it must maintain the elevators in operative condition, it must repair the elevators promptly once an elevator malfunctions, and it must take reasonable steps to accommodate an individual who otherwise would have used the elevators when the elevators are out of order. But the regulation does not subject Lafayette to liability for isolated or temporary interruptions in service due to repairs.

The DOT provided further guidance regarding the regulations in the published commentary. On the issue of maintenance and prompt repair, the DOT noted:

The rule points out that temporary obstructions or isolated instances of mechanical failure would not be considered violations of the ADA or this rule. Repairs must be made "promptly." *The rule does not, and probably could not, state a time limit for making particular repairs, given the variety of circumstances involved.* However, repairing accessible features must be made a high priority.

Transportation for Individuals with Disabilities, 56 Fed. Reg. 45,621 (Sept. 6, 1991) app. D, subpt. G, § 37.161 (emphasis added).

The DOT's interpretation of its own regulation makes sense: the only way to apply 49 C.F.R. § 37.161 is to consider the unique circumstances inherent in any particular

transportation service site. In other words, there are no universal definitions in the regulations for what is required to "maintain in operative condition" the accessibility features, to repair "promptly" such features, or to take "reasonable steps" to accommodate when the features are not accessible. The extent of inaccessibility covered by the terms "isolated or temporary" in 49 C.F.R. § 37.161 is likewise unclear and only determinable by considering the unique circumstances of the case.

Robert insists that Lafayette failed to maintain the elevators in operative condition. Furthermore, he argues that Lafayette did not repair the elevators promptly, and did not take reasonable steps to accommodate him—by clearing the ramp of snow, for instance. Lafayette argues that the elevator repairs, necessitated by the cold weather, led to a temporary or isolated interruption in service that should not be punished under the ADA.

Nothing in the record indicates frequent denial of access to disabled persons or a policy that neglects elevator maintenance. Lafayette has a long-term service contract with Kone, the elevator-repair company. The elevators have indeed been serviced on numerous occasions during this contractual relationship, but Robert does not attempt to show that Kone was not providing the necessary maintenance to limit extended outages of service or that any other individual had suffered harm from an elevator outage. In short, there was no evidence from which a reasonable inference could be drawn that other disabled persons were denied access because of frequent elevator breakdowns.

When contacted on December 18, Kone immediately dispatched an employee to the station. The problem, caused in part by the harsh weather conditions, could not be resolved on that day because replacement parts were unavailable. The next day, December 19, the situation was alleviated in part when one elevator was placed back in service. By

Friday, December 22, elevator operations were returned to normal. This appears, from the undisputed facts, to be a weather-related breakdown of elevator service which, given the conditions, was repaired promptly. Under 49 C.F.R. § 37.161, occasional elevator malfunctions, unaccompanied by systemic problems of poor maintenance policy or frequent denials of access, do not constitute violations.

Moreover, Lafayette has provided a reasonable accommodation for temporary elevator outages in the form of the ramp. The ramp to the pedestrian bridge provides an alternative means of access and egress for an event such as this—an elevator malfunction at the same time an individual with a disability is in need of elevator service.

An issue of fact has been raised as to whether the ramp was in fact passable at the time of Robert's arrival. But even assuming, as we must, that the ramp was impassable, that too was a temporary condition. The snowfall covered the sizeable exterior area of Riehle Plaza for which Taylor was responsible for snow removal. That Taylor had four-and-a-half hours notice that Robert was arriving but had not yet cleared the ramp by the time Robert's train arrived does not vitiate the temporary nature of the snow obstruction of the alternative accommodation—and the ADA was not violated.

In the face of the failure of both primary and alternative accommodations, O'Connor assisted Robert to his vehicle in the manner that Robert was forced to pursue—walking up the stairs. In such unusual circumstances—heavy snowfall, inoperative elevators, and frigid temperatures combining to create a difficult situation for a passenger at a station with very limited train traffic and personnel— O'Connor's actions constituted a reasonable emergency accommodation.

Although the undisputed facts show that Kone took five business days to complete the repairs, Robert argues that the elevators could have been fixed in time for Robert's

arrival had Taylor immediately contacted Kone on December 14 when he discovered they were not working. He also contends that Taylor could have cleared all of the snow off the ramp by the time the train arrived had Taylor properly allocated his time. His final assertion is that there is a reasonable inference that Taylor should have facilitated a less stressful escape from the platform— perhaps by opening up the machinery room to provide a temporary buffer against the wind while a quicker means of egress was found. But it is apparent that Robert alleges, at worst, individual, isolated instances of employee negligence and not a systemic problem with the policies of the City of Lafayette regarding the structure and operation of the train station. If there was negligence here on the part of Taylor, it did not constitute a violation of the ADA.[3] Isolated acts of negligence by a city employee do not come within the ambit of discrimination against disabled persons proscribed by the ADA. Taylor's conduct was neither a willful nor systematic effort on the part of Lafayette to deprive Robert the accommodation due him.

---

[3] A Colorado state court case illustrates this principle. *See Pack v. Ark. Valley Corr. Facility*, 894 P.2d 34, 39 (Colo. Ct. App. 1995). In *Pack*, the plaintiff slipped and fell in the handicapped area of the parking lot while visiting a correctional facility. *Id.* at 35. Along with a negligence claim, the plaintiff alleged that he was disabled and the accumulation of snow and ice in the parking lot violated the ADA by effectively denying him access to the public facility. *Id.* at 38. Applying 28 C.F.R. § 35.133, a regulation with language identical to that in 49 C.F.R. § 37.161(a) and (c), the Colorado court concluded that an isolated instance of alleged negligence by agents of the state—in this case, the failure of prison employees to remove the snow from the parking lot—could not violate the ADA, which was "intended instead to prevent consistent and discriminatory denial of access." *Pack*, 894 P.2d at 39.

### III. Conclusion

Neither the interruption of elevator service nor the alternative ramp's snow-covered condition, under the circumstances of this case, constitutes a violation of the ADA or the Rehabilitation Act of 1973. The district court's grant of summary judgment is AFFIRMED.

FLAUM, *Chief Judge*, dissenting.  This case presents the challenging question of whether a violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act occurred at the Lafayette, Indiana, train station in December of 2000. The rule promulgated by the Department of Transportation ("DOT") governing access to mass transit facilities compels that an inquiry be made to determine whether the steps taken by the City of Lafayette to accommodate disabled individuals in response to the station's elevator outage were reasonable. *See* 49 C.F.R. § 37.161. Considering the facts in this case, I conclude that the answer should appropriately come from a jury and I therefore must respectfully dissent.

Under the majority's interpretation, violations of 49 § C.F.R. 37.161 will occur only in situations where frequent or systemic problems in an entity's operation of mass transit facilities have been alleged. The rule itself states:

   a)   Public and private entities providing transportation services shall maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities. These

features include, but are not limited to . . . elevators.

(b) Accessibility features shall be repaired promptly if they are damaged or out of order. When an accessibility feature is out of order, the entity *shall take reasonable steps to accommodate individuals with disabilities* who would otherwise use the feature.

(c) This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

49 C.F.R. § 37.161 (2004) (emphasis added). In my view, sub-section (c) cannot be read in a manner that eliminates the requirement under sub-section (b) that during temporary outages "reasonable steps" must be taken to accommodate individuals with disabilities. If sub-section (c) were to provide blanket immunity for entities during temporary service interruptions, sub-section (b)'s second sentence would have no force. Clearly, the only types of interruptions in service contemplated under this regulation are those that are isolated or temporary. Consequently, it must be during these periods that the "reasonable steps to accommodate" duty applies—and thereby insulates an entity from liability if it is satisfied. Read in conjunction, sub-sections (b) and (c) dictate that while temporary interruptions in service are envisioned, repairs must be made "promptly" and "reasonable steps" must be taken to "accommodate individuals" when such interruptions arise. I am unable to find in sub-section (c), or in any other authority, support for a rule that discharges or diminishes an entity's "reasonable steps" duty absent frequent denials of access to disabled persons or a neglectful maintenance policy.

I agree with the majority that the elevator's inaccessibility in this case was an isolated and temporary interruption. Robert Foley ("Foley") does not attempt to show

that other disabled persons were denied access because of frequent elevator breakdowns. Furthermore, the breakdown at issue was temporary as the elevator was inoperable for at most a total of eight days. While a speedier repair would have been preferable, eight days is certainly not long enough to be considered permanent.

My disagreement with the majority arises over the reasonableness of Lafayette's response to the elevator outage. The majority concludes as a matter of law that the bicycle ramp to the pedestrian bridge and the assistance provided by Bill O'Connor, a non-city employee, constituted reasonable alternative accommodations. While not inherently without basis, I believe that this is a determination that should be addressed by a jury. Foley has put forth evidence to show that (1) Fred Taylor knew about the elevator outage for at least four days prior to Foley's arrival at the Lafayette station; (2) Taylor had nearly five hours advance notice of Foley's impending arrival; (3) Taylor shoveled portions of the station and platform, but not the ramp; and (4) Taylor knew that the ramp was snow-covered. Confronted with these facts, a jury could appropriately find that reasonable steps were not taken to accommodate Foley.

The majority finds dispositive the fact that these alleged inadequacies fall on the shoulders of a single employee, Taylor. In the majority's view, "[i]solated acts of negligence by a city employee do not come within the ambit of discrimination against disabled persons proscribed by the ADA." Majority opinion at 11. However, Foley's contentions reach beyond Taylor's failures to contact Kone or clear the bicycle ramp and extend to allegations of Lafayette's wrongdoing. Foley alleges that Lafayette knew of the problem at the station as soon as the heavy snowfall hit—the implication being that additional personnel should have been sent to the station to assist with the snow removal on the ramp. Furthermore, since an individual employee's actions might

be relevant to the reasonableness of an entity's response, there is no reason such conduct should not be considered in determining whether § 37.161(b) was violated.[4] Indeed, it is easy to envision a situation where an entity's entire response may consist of the actions of a sole individual.

"[R]easonable steps to accommodate" is not a rigid, one-size-fits-all mandate. Rather, the regulation is written to allow for flexibility in an entity's response to an interruption in service depending on the particular circumstances of the situation. What constitutes "reasonable steps" may be subject to change depending on the duration of the interruption, the cost of the proposed alternate accommodation, the resources available to the entity, or even the current weather conditions. Providing nothing beyond access to the bicycle ramp may be entirely reasonable as an accommodation when the train station's elevator malfunctions on a mild day. However, when the outage occurs during blizzard-like winter conditions, simply pointing wheelchair-bound passengers in the direction of the snow-covered ramp may well be insufficient.

Underscoring the need for entities to make particularized responses to problems as they arise, the DOT's published commentary regarding accommodating disabled individuals during service interruptions notes:

> The rule . . . requires that accommodations be made to individuals with disabilities who would otherwise use

---

[4] I am unpersuaded that the Colorado case cited by the majority provides useful guidance for the case at bar. *See Pack v. Arkansas Valley Correctional Facility*, 894 P.2d 34, 39 (Colo. Ct. App. 1995). The regulation at issue in *Pack*, 28 C.F.R. § 35.133, shares language identical to 49 C.F.R. § 37.161(a) and (c). However, the regulation in *Pack* has no counterpart to § 37.161(b)'s requirement that "reasonable steps to accommodate" be taken during temporary disruptions in service.

> an inoperative accessibility feature. For example, when a rail system discovers that an elevator is out of order, blocking access to one of its stations, it could accommodate users of the station by announcing the problem at other stations to alert passengers and offer accessible shuttle bus service around the temporarily inaccessible station. If a public address system were out of order, the entity could designate personnel to provide information to customers with visual impairments.

Transportation for Individuals with Disabilities, 56 Fed. Reg. 45,621 (Sept. 6, 1991) app. D, subpt. G, § 37.161.

The commentary examples do not represent systematic or generalized accommodations, but rather responses to particular service disruptions. Such an approach makes sense as it serves Title II's purpose of guaranteeing disabled persons equal access to the benefits and services of public entities. The disabled will be less likely to utilize trains, buses, and other services if during accessibility-feature outages they will be left out in the cold, literally. Under 49 C.F.R. § 37.161(b) Lafayette was not required to make Herculean efforts to accommodate Foley and other disabled travelers, just reasonable ones. In my judgment, whether the City of Lafayette satisfied this statutory duty presents a jury question. Therefore, I respectfully dissent from the majority's decision.

A true Copy:
       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—3-8-04