Second, there is no evidence to support the WCRC's theory that pavement shifting over time caused the out-of-compliance measurements found in 2017 and 2018. For instance, the Northwest and Northeast ramps at Arthur Street do not exhibit any signs of heaving, buckling, cracking, or settling in 2018. All flags of concrete were flush, and joints between ramp, curb, and gutter pan were flush and even. Shifting concrete is easily identifiable by visible cracking, distortion of joints, and changes in elevation resulting in uneven abutting slabs. None were observed at the curb ramps in the intersections at issue here.
Moreover, as of May 2018, none of the ramps showed signs of deterioration. All concrete slabs were level and abutting one to the other, and level with abutting curbs and abutting gutters in every instance. The expansion joints between slabs, gutters and curbs were evenly spaced and uniform. Bollinger testified that shifted concrete is easily identifiable by visible cracking, distortion of joints, and changes in elevation resulting in uneven abutting slabs. But there was no heaving, shifting, buckling, cracking or settling observed by any witness that would indicate that the ramp slopes exist in a different state today than they did in 2007. The City witnesses reasonably inferred that the condition of the ramps has not changed since 2007 and that the inter-curb slopes found were those as the ramps had been constructed. Mr. McCulloch of the WCRC could not recall changes in elevation or uneven abutting slabs. He did not measure slopes on his April 2018 inspection of the one set of crossings he did look at.
There has been no showing of an intervening cause that the several abutting, disconnected, separately poured sections of flat and sloped concrete, curbs and gutters all settled, heaved, or otherwise shifted simultaneously in identical proportion creating the illusion of solid original construction. The WCRC did not present a witness having personal knowledge of the curb ramps having been in any different condition or having personal knowledge that the ramps were ADA-compliant when installed.
Chelsea has not altered or otherwise manipulated the structure of the curb ramps installed by WCRC in 2007 under permit or otherwise.
It is more likely than not, therefore, that the WCRC failed to comply with the requirements of MDOT specification R-28-F when in 2007 it constructed the curb ramps at the intersection of Old US-12 and Wilkinson Street, the intersection of Old US-12 and Lane Street, the intersection of Old US-12 and Arthur Street, and the intersection of Old US-12 and Taylor Street/Old Manchester Road.
Finally, the WCRC has created an ongoing condition by throwing sand onto the roads and gutters along Old US-12 throughout the winter months. The sand regularly washes along the gutters and into the ramps by rainwater and snow melt. The WCRC does not sweep Old US-12 *736 or remove the sand deposited by it. Chelsea does not spread sand on its streets or on M-52, which it maintains under contract with MDOT.
II. Evidentiary Issues
The WCRC contests the admissibility of the Grawi and Clark depositions. The plaintiffs offered those under Federal Rule of Civil Procedure 32(a)(4)(B) (allowing use at trial when "the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition") and Federal Rule of Evidence 804(b)(1) (former testimony of an unavailable witness). Plaintiffs' counsel represented at trial that both witnesses were not in Michigan at the time of trial, and all parties had an opportunity to examine them at their discovery depositions.
Counsel for the WCRC took Grawi's deposition in another lawsuit after the trial proofs in this case were concluded. Grawi testified there that she moved to Florida in January 2018 and was no longer employed by AACIL. She acknowledged that she returned to Michigan from time to time for personal and business reasons. However, she was not in the state in late May and early June 2018 when the trial in this case was held. She testified, though, that plaintiffs' counsel told her that she would not be required to return to Michigan for the adjourned trial date, since she did not have other business in the state at the time. She stated that coming to trial then might have caused her difficulty if she could not get time off work, and she would have to bear the travel expense. Counsel for the WCRC then filed a motion to strike Grawi's deposition testimony, but he disregarded the requirement of E.D. Mich. LR 7.1(a), which requires that he confer with his counterpart before filing such a motion.
The refusal of WCRC counsel to make any effort to comply with the local rule is disturbing, betrays a fundamental misunderstanding of the meet-and-confer requirement of LR 7.1, and would justify dismissal of the motion, even if it had merit. It is apparent from the filings, however, that plaintiffs' counsel did not "procure" Grawi's absence from trial. He had arranged for her to be present for trial when it was originally scheduled for April 30, 2018. At the final pretrial conference held on April 25, the Court adjourned the trial to May 29, 2018. Plaintiffs' counsel asserted in his response to the WCRC's motion that he in fact told Grawi that she did not have to show up at trial on April 30, because the trial had been adjourned. Nor can it be said that plaintiffs' counsel engaged in willful misconduct or that he caused Grawi not to attend the trial in person. She moved to Florida on her own and was beyond the geographic subpoena authority of the Court. See Fed. R. Civ. P. 45(c)(1)(A) (authorizing a Court to issue a subpoena to command the appearance of a witness at trial "within 100 miles of where the person resides, is employed, or regularly transacts business in person"). The essence of defense counsel's accusation is that plaintiffs' counsel apparently told Grawi (correctly) that she did not have to honor a subpoena that required her to appear for a trial being held more than 100 miles from where she then lived. See K.S. v. Detroit Pub. Sch. , No. 14-12214, 2015 WL 6671560, at *1 (E.D. Mich. Nov. 2, 2015) (citing United States ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc. , 444 F.3d 462, 468 (6th Cir. 2006) ). No misconduct occurred by conveying that advice. Rule 32(a)(4)(B) authorizes the use of Grawi's deposition at trial. The WCRC's motion to strike that testimony will be denied.
*737 Deborah Clark encountered similar circumstances. She was prepared to testify in person at the April 30 trial. However, she was committed to travel plans, which overlapped with the adjourned trial date on May 29. She was 2,000 miles from the courthouse, and therefore was unavailable. There is no evidence that Clark manipulated her travels to avoid appearing at trial, or that her "absence was procured by the party offering the deposition." Fed. R. Civ. P. 32(a)(4)(B). Her testimony by deposition is allowed.
The WCRC also objected to testimony and exhibits that pertained to measurements of the curb ramps taken in early May 2018 shortly before trial. The basis of the objection was that Chelsea and the plaintiffs did not disclose that evidence under the pretrial disclosure requirement of Federal Rule of Civil Procedure 26(a)(1). The Court granted the WCRC's motion to exclude evidence of measurements taken on March 22, 2017, as they duplicated earlier measurements made in 2016. However, as part of their trial preparation, representatives of Chelsea and the plaintiffs returned to the scene and took measurements of different parts of the gutter pans and curb ramps at the subject intersections. The attorneys for the WCRC were notified in advance, but they refused to participate. The evidence was offered at trial through Derik Bollinger's testimony on a separate record.
Rule 26(a)(1) governs initial disclosures at the commencement of a lawsuit and requires each party, "without awaiting a discovery request," to inform opposite parties "of each individual likely to have discoverable information - along with the subjects of that information - that the disclosing party may use to support its claims or defenses"; furnish all documents "and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses"; and to disclose damages calculations and insurance information. Fed. R. Civ. P. 26(a)(1)(A)(i)-(iv). After a party makes its initial disclosures it has a continuing duty seasonably to supplement them "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ P. 26(e)(1)(A).
It has been said that the purpose of Rule 26 is to prevent "trial by ambush," permitting opposing counsel sufficient information to allow cross-examine with advance preparation. See Macaulay v. Anas , 321 F.3d 45, 50, 52 (1st Cir. 2003). The initial disclosure requirements "are designed to accelerate the exchange of basic information and help focus the discovery that is needed, and facilitate preparation for trial or settlement." Poitra v. Sch. Dist. No. 1 in the Cty. of Denver , 311 F.R.D. 659, 663 (D. Colo. 2015) (internal quotation marks, citations, and brackets omitted). The rule was never intended, however, to inhibit a party's ability for trial preparation. In fact, a separate section of Rule 26 actually limits discovery of trial preparation materials. See Fed. R. Civ P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent".)).
The information gathered during the scene visit of May 1, 2018 did not fall within any of the Rule 26(a)(1)(A) categories, and the non-disclosure did not trigger any preclusion or other sanction found in Rule 37(c)(1). The WCRC has not pointed to any other discovery demand that would have required supplementation with the data gathered on May 1. The measurement *738 activity amounted to trial preparation, just like witness interviews and preparation of exhibits. Closure of formal discovery under a case management order entered under Rule 16 does not signal the end of additional investigation or evidence gathering in any case.
There was no obligation here to share trial preparation material. Nonetheless, the WCRC was informed of the activity in advance and chose to ignore the opportunity, apparently relying on the misguided notion that late-gathered information could be excluded from evidence. But the discovery rules have never encouraged such a head-in-sand approach to litigation. And the measurements of the curb ramps on a public street were there for all to see, even counsel for the WCRC, should he have chosen to bring his engineers to the site on May 1 or any other day. There is no basis to exclude evidence of the measurements and curb ramp conditions observed on May 1, 2018.
III. Conclusions of Law
A. Statutory Provisions
1. The ADA and its Regulations
Title II of the ADA prohibits the exclusion of a "qualified individual with a disability" from "participation in" or enjoying the "benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. It also prohibits "discrimination by any such entity." Ibid.
A "qualified individual with a disability" within the meaning of the ADA is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, [or] the removal of architectural ... barriers ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). All of the individual plaintiffs fit within this definition. They all suffer from a disability that affects their mobility, and they all sought - and continue to seek - to use the sidewalk facilities within the City of Chelsea. Curb ramps constructed to conform with the ADAAG and UFAS amount to reasonable accommodations.
" 'Public entity' includes 'any state or local government' and 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.' " Ability Center of Greater Toledo v. City of Sandusky , 385 F.3d 901, 904 (6th Cir. 2004) (quoting 42 U.S.C. § 12131(1)(A) & (B) ). The City of Chelsea and the Washtenaw County Road Commission are "public entities."
Through section 204 of the ADA, Congress granted to the Attorney General the "authority to promulgate regulations to implement its provisions." Ibid. (citing 42 U.S.C. § 12134 ). One of those regulations, 28 C.F.R. § 35.151, governs construction and alteration of public facilities commenced after January 26, 1992. When the alteration "could affect the usability of the facility," the alterations must be designed and constructed "in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities.' " Ibid. (quoting 28 C.F.R. § 35.151(b) ). The regulations define the term "facility" to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104. The sidewalks and curb ramps along the relevant portion of Old US-12 are "facilities" within the meaning of the regulations.
As the Court explained in its previous opinion in this case, " 'To be "readily accessible, *739 " any part of a newly constructed or altered facility must be constructed in conformance with the ADAAG, 28 C.F.R. Pt. 36, App. A, or with the UFAS, 41 C.F.R. Pt. 101-19.6, App. A.' " Mote v. City of Chelsea , 252 F. Supp. 3d 642, 649 (E.D. Mich. 2017) (citing Daubert v. Lindsay Unified Sch. Dist. , 760 F.3d 982, 986 (9th Cir. 2014) ; 28 C.F.R. § 35.151(c)(1)-(3) ). The ADAAG is a set of regulations that set out, in comprehensive detail, the design specifics for structures and facilities to make them "readily accessible" to disabled persons. The regulations also require a public entity to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R. § 35.133.
With respect to curb ramps, section 35.151(i) expressly requires that "(1) Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway," and "(2) Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." 28 C.F.R. § 35.151(i). The DOJ has interpreted this regulation to require that "[w]hen streets, roads, or highways are newly built or altered, they must have ramps or sloped areas wherever there are curbs or other barriers to entry from a sidewalk or path. Likewise, when new sidewalks or paths are built or are altered, they must contain curb ramps or sloped areas wherever they intersect with streets, roads, or highways." U.S. DOJ, ADA Title II Technical Assistance Manual II-6.6000 (https://www.ada.gov/taman2.html ).
The ADAAG sets forth detailed specifications for the location and construction of curb ramps in Section 4.7 of the Guidelines (1991 version). As an initial matter, the Guidelines define the term "accessible route" as "[a] continuous unobstructed path connecting all accessible elements and spaces of a building or facility." ADAAG 3.4. "Exterior accessible routes may include parking access aisles, curb ramps, crosswalks at vehicular ways, walks, ramps, and lifts." Ibid. The phrase "curb ramp" refers to "[a] short ramp cutting through a curb or built up to it." Ibid. "If an accessible route has changes in level greater than ½ in (13 mm), then a curb ramp ... shall be provided that complies with [ADAAG 4.7]." ADAAG 4.3.8. "Curb ramps complying with [ADAAG 4.7] shall be provided wherever an accessible route crosses a curb." ADAAG 4.7.1.
"Slopes of curb ramps shall comply with [ADAAG 4.8.2]." ADAAG 4.7.2. Section 4.8.2 specifies that "[t]he least possible slope shall be used for any ramp," "[t]he maximum slope of a ramp in new construction shall be 1:12," and "[t]he maximum rise for any run shall be 30 [inches]." ADAAG 4.8.2. "Transitions from ramps to walks, gutters, or streets shall be flush and free of abrupt changes," and "[m]aximum slopes of adjoining gutters, road surface immediately adjacent to the curb ramp, or accessible route shall not exceed 1:20." Ibid. "The minimum width of a curb ramp shall be 36 [inches], exclusive of flared sides." ADAAG 4.7.3. "Surfaces of curb ramps shall comply with [section] 4.5." ADAAG 4.7.4. Section 4.5 covers "ground and floor surfaces" generally and states, among other things, that (1) "[g]round and floor surfaces along accessible routes and in accessible rooms and spaces including floors, walks, ramps, stairs, and curb ramps, shall be stable, firm, [and] slip-resistant"; (2) changes in level less than ¼" may be "vertical and without treatment"; and (3) changes between ¼ and ½" must *740 be beveled and with a slope no greater than 1:2. ADAAG 4.5.1-4.5.2.
Curb ramps must "be located or protected to prevent their obstruction by parked vehicles," and ramps "at marked crossings shall be wholly contained within the markings, excluding any flared sides." ADAAG 4.7.8-4.7.9. "Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces." ADAAG 4.8.8.
2. The Rehabilitation Act
Section 504 of the Rehabilitation Act parallels the command of the ADA concerning accessibility to public facilities for persons with disabilities, but it applies only to "any program or activity receiving Federal financial assistance.' " Babcock v. Michigan , 812 F.3d 531, 540 (6th Cir. 2016) (quoting 29 U.S.C. § 794(a) ). "[T]he remedies, procedures, and rights available under Title II of the ADA parallel those available under [The Rehabilitation Act]." Ability Center , 385 F.3d at 905 & n.7 (citing 29 U.S.C. 794a(a)(2) ; Barnes v. Gorman , 536 U.S. 181, 189 n.3, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) ; Johnson v. City of Saline , 151 F.3d 564, 573 (6th Cir. 1998) ). Thus, the Sixth Circuit has explained that its "analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are 'quite similar in purpose and scope.' " Babcock , 812 F.3d at 540 (quoting McPherson v. Michigan High School Athletic Association, Inc. , 119 F.3d 453, 459-60 (6th Cir. 1997) ).
The regulations enacted under the Rehabilitation Act apply "to each recipient of Federal financial assistance from the Department of Transportation and to each program or activity that receives such assistance," and require that "all [ ] entities subject to section 504 shall design, construct, or alter buildings, or other fixed facilities, in conformance with appendices B and D of 36 C.F.R. part 1191, as modified by appendix A to part 37 of this title." 49 C.F.R. § 27.3. "The Rehabilitation Act has a set of standards nearly identical to the ADAAG called the Uniform Federal Accessibility Standards ('UFAS'). 41 C.F.R. pt. 101-19.6, app. A." Greer v. Richardson Indep. Sch. Dist. , 472 F. App'x 287, 291 n.2 (5th Cir. 2012). The WCRC is subject to both the ADAAG and the UFAS with respect to the 2007 renovation project for Old US-12.
3. State Law
The state law counterpart to these two federal statutory mandates is the Michigan Persons With Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1101, et seq. That enactment " 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.' " Donald v. Sybra, Inc. , 667 F.3d 757, 764 (6th Cir. 2012) (quoting Cotter v. Ajilon Servs., Inc. , 287 F.3d 593, 597 (6th Cir. 2002) ).
B. Standing
The WCRC argues that the plaintiffs lack standing to pursue their claims for injunctive and declaratory relief because they have not suffered an injury in fact, and they have not shown that any accessibility deficit is fairly traceable to the WCRC.
The requirement of standing comes from Article III's limitation on the judicial power of federal courts to adjudicate only actual cases and controversies. It seeks to ensure the plaintiff has a "personal stake in the outcome of the controversy" at the outset of litigation. Baker v. Carr , 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
*741 To establish standing, a plaintiff must show that he or she has suffered an "injury in fact," that was caused by the defendant's conduct, and that a favorable decision will redress that injury. Kanuszewski v. Michigan Dep't of Health & Human Servs. , 927 F.3d 396, 404-05 (6th Cir. 2019) (citing Nikolao v. Lyon , 875 F.3d 310, 315-16 (6th Cir. 2017) ; see also Susan B. Anthony List v. Driehaus , 573 U.S. 149, 157-58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) ) (quoting Lujan v. Defs. of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). The first requirement requires proof of "an injury in fact, which is 'concrete, particularized, and actual or imminent.' " Id. art *3 (quoting Clapper v. Amnesty Int'l USA , 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) ). For a plaintiff seeking injunctive or declaratory relief, the mere occurrence of past harm will not do. City of Los Angeles v. Lyons , 461 U.S. 95, 106, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." National Rifle Ass'n of Am. v. Magaw , 132 F.3d 272, 279 (6th Cir. 1997). "Past exposure to illegal conduct" will suffice to demonstrate an injury in fact that warrants declaratory or injunctive relief when the past injury is accompanied by "continuing, present adverse effects." Sullivan v. Benningfield , 920 F.3d 401, 407-08 (6th Cir. 2019) (quoting O'Shea v. Littleton , 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ; Grendell v. Ohio Supreme Court , 252 F.3d 828, 832 (6th Cir. 2001) ).
The individual plaintiffs have satisfied these requirements. They have described the accessibility barriers at the subject intersections caused by the standing water and accumulated debris found regularly on the curb ramps. Those conditions were persistent and caused by construction that did not comply with the ADAAG and UFAS. The WCRC neither graded the curb ramps properly nor installed the drainage recommended by MDOT specification R-28-F, nearly guaranteeing that water will accumulate whenever there is more than moderate rainfall. There is a significant possibility of future harm, which was caused by the faulty construction, and ordering compliance likely will redress the injury.
The question of AACIL's standing was addressed in a prior opinion filed in this case. See Mote v. City of Chelsea , 284 F. Supp. 3d 863, 886-88 (E.D. Mich. 2018) (citing Havens Realty Corp. v. Coleman , 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (holding that an advocacy organization for the homeless had standing to proceed against the defendants in a discrimination action, where its complaint alleged that the organization had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," and that the organization "had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices")).
C. Failure of Compliance
The command of the governing statutes in this case is clear: public entities must construct their facilities so that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Moreover, "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from participation in, be denied *742 the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Because the improvements to Old US-12 occurred after 1996, the WCRC was required to design and construct the curb ramps so that they would be " 'readily accessible and usable by individuals with disabilities.' " Ability Center of Greater Toledo , 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b) ). Michigan's PWDCRA contains similar requirements.
The regulations, discussed above, prescribe detailed specifications to ensure proper grades and slopes that strike a balance between ease of use by wheelchair-bound individuals and the proper flow of water to allow adequate drainage. Curb ramps must be designed and constructed to prevent the accumulation of water. ADAAG 4.6.1, 45.10. The plaintiffs have shown by a preponderance of the evidence that the WCRC's construction of nearly all of the curb ramps at the intersection of Old US-12 and Wilkinson Street, the intersection of Old US-12 and Lane Street, the intersection of Old US-12 and Arthur Street, and the intersection of Old US-12 and Taylor Street/Old Manchester Road failed to comply with those regulations.
The testimony established that the curb ramps are constructed of several separately-poured concrete components. The concrete curb and gutter is poured first and allowed to cure for three days. The ramp is then built upward from the curb to the sidewalk, and the sidewalk is built from there onward. According to both Mr. Bollinger and Mr. McCulloch, the gutter pan and curb can be removed independently and re-poured to cure defects in design and installation. Bollinger testified that this procedure actually has been done by the WCRC on at least one occasion.
Whether that approach will be sufficient to cause compliance in this case is not clear from the record. The MDOT specification R-28-F calls for the placement of drains proximate to the curb ramps to allow for proper drainage. There is insufficient evidence in this record to conclude that drain placement is necessary to bring the curb ramps into compliance with the ADAAG and UFAS. WCRC engineer Mark McCulloch explained that adding drains would increase costs and was not in the scope of the project. However, for renovations constructed after 1992, "the regulations require compliance with specific architectural accessibility standards." Tennessee v. Lane , 541 U.S. 509, 532, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Cost certainly is a valid consideration when a public entity is considering an improvement to a facility, but once a decision is made to pursue the project, it is not a defense to violation of the ADA. See 28 C.F.R. 35.151(b) ; Kinney v. Yerusalim , 9 F.3d 1067, 1074-75 (3rd Cir. 2003) (holding that "once the City undertakes to resurface a street, the accompanying curbs are no longer to be considered as existing facilities, subject to the 'undue burden' defense of § 35.150(a)(3)").
The WCRC must rework the offending curb ramps to improve drainage and to eliminate the incidence of standing water and the deposits of debris on the curb ramps. If replacing the curb ramps solves the problem, compliance likely would be achieved. If not, then installation of additional drainage may be required.
Some of the plaintiffs also complained about the conditions of the curb ramps at Silver Maples Drive and Old US-12. The WCRC did not construct those curb ramps and has no liability for their conditions. Chelsea was responsible for the construction of the ramps at that intersection, but the plaintiffs have offered no *743 evidence that the ramps do not comply with the ADAAG or the UFAS. They only offer anecdotal evidence of the conditions of the curb ramps following a heavy rain. And they submitted a photograph in evidence showing a pothole in the intersection, which Chelsea says was repaired by trial time. They have not sustained their burden against either defendant as to that intersection for prospective relief.
Finally, the plaintiffs argue that Chelsea is liable for the defectively-constructed curb ramps along Old US-12 because it issues permits for work the WCRC performed in the City's right-of-way. It is true that the ADA regulations impose obligations on a public entity to ensure that accessibility features are incorporated and that the ADAAG specifications are complied with any time that a public facility is altered or newly constructed, after 1992, " 'by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility' " Ability Center , 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b) ) (emphasis added). The "project log" and the letter regarding the permit process suggest that the City was involved at the very least in issuing required permits to allow the project to proceed. However, Chelsea had no inspection obligation concerning the project, and the WCRC never furnished Chelsea with any of its IDRs or the Form 1120 Final Inspection Report. The plaintiffs have not sustained their burden of proving that Chelsea is jointly liable with the WCRC for any resulting ADA defects in the sidewalks and curb ramps.
D. Construction Versus Maintenance
Chelsea and the WCRC point fingers at each other, alleging fault for the inaccessible conditions of the curb ramps along the stretch of Old US-12 altered during the 2007 resurfacing project. Citing a state law that assigns to the City the responsibility of maintaining sidewalks within its borders, Mich. Comp. Laws Ann. § 691.1402a(1) ("A municipal corporation in which a sidewalk is installed adjacent to a municipal, county, or state highway shall maintain the sidewalk in reasonable repair."), the WCRC argues that the water accumulation and debris collection is purely a maintenance issue. Chelsea says that the water and debris collect on the ramps precisely because of the faulty construction, and no maintenance will cure the problem long-term. The plaintiffs have reached a settlement with the City of Chelsea over the conditions of other sidewalks, curb ramps, and parking facilities within the City; but the plaintiffs argue that the defendants should be jointly liable under the ADA, the Rehabilitation Act, and state law for the curb ramps along Old US-12.
The pertinent provision of the ADAAG and other regulations governing curb ramps states simply that "[s]urfaces of curb ramps shall comply with 4.5." ADAAG § 4.7.4. As noted above, Section 4.5 covers ground and "floor surfaces," and generally requires that "curb ramps[ ] shall be stable, firm, [and] slip-resistant.". ADAAG § 4.5.1. It also includes design specifications. Id. § 4.5.2. There are other pertinent regulations, but they speak to design and construction, not maintenance. E.g. , Id. § 4.8.8 ("Outdoor ramps and their approaches shall be designed so that water will not accumulate on walking surfaces."). The regulations do not refer to maintenance specifically.
Certainly, though, if a surface was constructed to be "slip-resistant," but the presence of debris defeats the slip-resistant construction features, which could be restored if the debris were removed, an obligation to maintain accessibility might *744 be triggered. However, no amount of cleaning, or even water and debris removing, can make a ramp compliant with the guideline that requires it to not accumulate water in the first instance. Therefore, there also is a separate obligation to fix the ramp so there is no accumulation. No amount of maintenance can cure the underlying compliance violation, where the ramps were out of compliance as built initially, and no amount of "sweeping up" can restore them to compliance with respect to the basic construction defect. Any maintenance lapse does not absolve the WCRC of its primary liability.
The plaintiffs have not cited any regulations under any of the applicable statutes that might address an obligation to remove debris left behind after the standing water evaporates. The cases on point hold generally that a merely temporary accumulation of debris on a surface is not an ADA violation, even if accessibility is impaired. There is no clear definition of a "temporary" obstruction, and the cases are fact-specific.
It is generally acknowledged that "[a] sidewalk is a 'facility,' and sidewalks built or altered after January 26, 1992, must be 'readily accessible to and useable' by people with disabilities." Straw v. Village of Streamwood , 734 F. App'x 344, 347 (7th Cir. 2018), reh'g denied (June 5, 2018) (quoting 28 C.F.R. §§ 35.104, 35.151 ). The responsible public entity "must maintain [accessibility features] in operative condition, it must repair [them] promptly [if they] malfunction[ ], and it must take reasonable steps to accommodate an individual who otherwise would have used the [features] when [they] are out of order." Foley v. City of Lafayette , 359 F.3d 925, 929 (7th Cir. 2004). "But the [regulations under the ADA and Rehabilitation Act do] not subject [municipalities] to liability for isolated or temporary interruptions in service due to repairs." Ibid.
"[T]here are no universal definitions in the regulations for what is required to 'maintain in operative condition' the accessibility features, to repair 'promptly' such features, or to take 'reasonable steps' to accommodate when the features are not accessible. The extent of inaccessibility covered by the terms 'isolated or temporary' ... is likewise unclear and only determinable by considering the unique circumstances of the case." Ibid. In Foley , the court held that a merely temporary accumulation of debris such as dirt, ice, or snow is not sufficient to trigger liability under the ADA or Rehabilitation Act, even where the responsible entity was notified of a problem that impaired accessiblity and had ample time to act. Foley , 359 F.3d at 930 ("[E]ven assuming, as we must, that the ramp was impassable, that ... was a temporary condition. The snowfall covered the sizeable exterior area of Riehle Plaza for which Taylor was responsible for snow removal. That Taylor had four-and-a-half hours notice that Robert was arriving but had not yet cleared the ramp by the time Robert's train arrived does not vitiate the temporary nature of the snow obstruction of the alternative accommodation - and the ADA was not violated."). But if the record shows that there was "frequent denial of access to disabled persons or a policy that neglects [accessibility feature] maintenance," where the responsible entity makes no attempt to offer reasonable accommodations to disabled users during periods of inaccessibility, then the defendant may be liable for neglect of its maintenance obligation. Id. at 929.
In this case, the undisputed facts establish that Chelsea does not spread sand on its own streets, nor does it maintain Old-US-12 as it does not receive any *745 funding for such activity, and does not have a maintenance contract with the WCRC. Chelsea's Department of Public Works maintenance procedures provide that after a complaint is received by the City offices, a work order is produced and maintenance staff address the complaint. No party has contradicted Chelsea's assertion that it had never received any complaint about the curb ramps at issue until this lawsuit was filed. Therefore, the plaintiffs have not carried their burden of showing that Chelsea "frequent[ly] deni[ed] access to disabled persons" or that it maintained "a policy that neglects maintenance" of the curb ramps to make them accessible to persons with disabilities.
IV. Conclusion
The plaintiffs have standing to proceed with their claims for prospective relief against the defendants under the Americans With Disabilities Act, the Rehabilitation Act, and Michigan's Persons With Disabilities Civil Rights Act. The deposition testimony offered by the plaintiffs at trial is properly received in evidence. The evidence of the gutter pan and curb ramp measurements taken in May 2018 are properly received in evidence. The Washtenaw County Road Commission failed to construct the gutter pans and curb ramps in compliance with applicable regulations and specifications promulgated under the ADA and the Rehabilitation Act at the following intersections of Chelsea city streets with Old US-12: two (2) at Wilkinson Street, four (4) at Lane Street, four (4) at Arthur Street, and six (6) at Taylor Street/Old Manchester Road. The City of Chelsea is not liable for the conditions of the intersection crosswalks (including curb ramps) along Old US-12 within its city limits.
For the reasons stated, the Court will enter judgment for injunctive and declaratory relief in favor of the plaintiffs and against defendant Washtenaw County Road Commission on Counts I and II of the second amended complaint. The Court will enter judgment in favor of defendants City of Chelsea and the Chelsea Downtown Development Authority and against the plaintiffs on Counts I, II, and III of the second amended complaint. Except as to the claims addressed by the consent judgment entered between the plaintiffs and the City of Chelsea and its Downtown Development Authority, the second amended complaint will be dismissed with prejudice as to defendants City of Chelsea and the Chelsea Downtown Development Authority. The third-party complaint seeking indemnity from the Washtenaw County Road Commission for any liability imposed upon defendant City of Chelsea for violations of the ADA and the Rehabilitation Act will be dismissed as moot.